**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **CHARLES E. THORNSLEY,** ) | **CASE NO.5:10CV1868** |
| ) | |
| Plaintiff, ) | **JUDGE JOHN R. ADAMS** |
| ) | |
| v. ) | **MAGISTRATE JUDGE GREG WHITE** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Charles E. Thornsley ("Thornsley"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Thornsley's claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be affirmed.

**I. Procedural History**

On August 21, 2006, Thornsley filed an application for POD, DIB, and SSI alleging a disability onset date of January 15, 2004, and claiming that he was disabled due to manic depression, chronic back pain and high blood pressure. (Tr. 13.) His application was denied both initially and upon reconsideration. Thornsley timely requested an administrative hearing.

On November 4, 2009, an Administrative Law Judge ("ALJ") held a hearing during which Thornsley, represented by counsel, testified. Thomas F. Nimberger, an impartial Vocational Expert ("VE") also testified. On December 14, 2009, the ALJ found Thornsley was

able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II. Evidence

*Personal and Vocational Evidence*

Age forty-four at the time of his alleged disability onset date, Thornsley is a "younger" person under social security regulations. *See* 20 C.F.R. §§ 404.1563; 416.963 (Doc. No. 9-2 at 24.) He has a limited education and past relevant work as a tow-motor operator.

*Medical Evidence from the Veterans Administration ("VA") as to Mental Impairments*[1]

On May 4, 2004, Thornsley was evaluated by Susan Phillips, a VA clinical nurse specialist, who diagnosed depressive disorder, post traumatic stress disorder ("PTSD") (subclinical), alcohol abuse (in remission), and marijuana use (episodic). (Tr. 249.) Nurse Phillips assigned a Global Assessment of Functioning ("GAF") score of 55, indicating a moderate impairment in functioning.[2] She noted that Thornsley's "symptoms are largely remitted with [ ] Sertraline." *Id.*

Paul Davis, a social worker, also evaluated Thornsley on May 4, 2004, noting he had a history of suicidal/homicidal ideation, talked to his deceased father when he decompensated, was laid off and had lost his health insurance, has been sober since alcohol-abuse treatment in 1996, used marijuana four to six times a month, and had a history of eight DUI convictions, the last of which inspired his treatment and sobriety. (Tr. 250-253.) Mr. Davis diagnosed depressive disorder not otherwise specified, marijuana abuse, alcohol dependence in full remission, and

---

[1]Although the ALJ found Thornsley to have severe physical impairments, Thornsley concedes that the evidence clearly illustrates a predominantly mental disability. (Doc. No. 12 at 2-3, fn. 1.) The Court, therefore, focuses on Thornsley's mental impairments.

[2]A GAF score between 51 and 60 indicates that the person experiences "moderate" difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed. 2009).

assigned Thornsley a GAF score of 45.³  (Tr. 252.)

On August 11, 2004, Thornsley reported to Nurse Phillips that he was doing well and experienced no increase in PTSD symptoms.  (Tr. 311.)  He denied feeling suicidal, depressed or hopeless.  *Id*.  He also talked about outings with his children and "enjoying his summer."  *Id*.  Nurse Phillips reported that he is "doing well with the current dose of Sertraline [and that there was] no increase in the PTSD symptoms."  *Id*.

On the same day, Thornsley was evaluated again by Paul Davis, who reported that Thornsley was spending his time fishing, collecting unemployment, and looking for work, but was in "no hurry to go back."  (Tr. 312.)  Thornsley indicated that hearing news of violence in the Middle East caused him to become depressed.  *Id*.  In that regard, he also discussed not letting things out of his control bother him.  *Id.*

On November 12, 2004, Thornsley was examined again by both Mr. Davis and Nurse Phillips.  Both noted that he had not been depressed (Tr. 303, 305), although news of the war in the Middle East bothered him.  (Tr. 303.)  Thornsley indicated that he felt fine as long as he was taking his medications and he was planning a trip to Florida.  (Tr. 305.)  Nurse Phillips kept him on the same dosage of Sertraline.  (Tr. 304.)

Throughout 2005, Thornsley continued to see Nurse Phillips and Mr. Davis, maintaining the diagnosis of PTSD and depression during the year.  (Tr. 301-303.)  On May 16, 2005, Nurse Phillips noted Thornsley was having marital problems due to his unemployment.  Apparently, his wife was calling him a "free loader" because he had been unable to find work.  (Tr. 291.)  Mr. Davis noted on the same date that Thornsley's marijuana use had been causing problems, and that his wife had given him an ultimatum to find work or she would leave.  (Tr. 293-295.)

On August 11, 2005, Thornsley reported to Nurse Phillips that he was frustrated with his wife's decision to seek a divorce.  He maintained that the biggest issue between them was that he had been unable to find work, although he admitted that he did not follow through on job

---

³A GAF score between 41 through 50 indicates serious difficulty.  *Diagnostic and Statistical Manual of Mental Disorders* at 34.

3

applications.  He was not suicidal, but had thoughts of hopelessness.  He planned to continue therapy with Mr. Davis.  Nurse Phillips indicated that Thornsley's marijuana use interfered with his treatment.  (Tr. 288-289.)

In December, 2005, Thornsley underwent substance-abuse treatment and was evaluated by Omar Elhaj, Psychiatrist.  (Tr. 330-336.)  Dr. Elhaj diagnosed Thornsley with marijuana dependence, alcohol dependence in sustained partial remission, nicotine dependence, depressive disorder not otherwise specified, rule out PTSD[4], and borderline personality features.  He assigned Thornsley a GAF score of 40.[5]  (Tr. 335.)

In January, 2006, Sandra Premura, a Registered Nurse, conducted a mental health evaluation.  (Tr. 317, 382-388.)  She found Thornsley to have a history of drug and alcohol problems.  (Tr. 384-385.)  Thornsley reported "serious" depression, anxiety, hallucinations, trouble understanding, concentrating or remembering (all in the past thirty days and throughout his life), and difficulty controlling violent behavior (lifetime).  (Tr. 388.)  He also reported suicide attempts, although his last attempt was in 1996.  *Id.*  He indicated having bad memories of shooting someone in the head and burying bodies during the Gulf War.  *Id.*  Jennifer Finnerty, a psychologist, reported that Thornsley participated in a group session where he "appeared to gain insight into his emotional patterns."  (Tr. 389.)

In February, 2006, Thornsley was evaluated by John VanNostran, a social worker, to determine his eligibility for continued residency with the VA.[6]  (Tr 492-497.)  Mr. VanNostran diagnosed alcohol, cannabis and amphetamine dependence, PTSD, depressive disorder, and borderline personality disorder.  (Tr. 495.)  He assigned a GAF score of 40.  (Tr. 495.)  During

---

[4]The Court notes, however, that Dr. Elhaj, after performing a PTSD screen with positive results, referred Thornsley to "Mental Health."  (Tr. 336.)

[5]A GAF score in the range of 31-40 indicates some impairment in reality testing or communication or major impairments in several areas, such as work or school, family relations, judgment, thinking or mood.  Diagnostic and Statistical Manual of Mental Disorders at 32.

[6]After the evaluation, the bed level of care was changed from community to domiciliary on February 22, 2006.  (Tr. 497.)

4

the evaluation, Thornsley denied any limitations to working and stated that he likes a "hands on" style of work. (Tr. 495.) He also stated that he learns quickly, gets along well with authority, and that his goal was to find a job. (Tr. 496.) Mr. VanNostran referred him to a vocational rehabilitation program. (Tr. 497.)

After a mild relapse in February, 2006, Thornsley was treated by Indiradevi Vellanki, M.D., who diagnosed substance dependence, depressive disorder, PTSD, and borderline personality disorder. (Tr. 755-757.) He assigned Thornsley a GAF score of 40 and discharged him with no physical or dietary limitations, noting that he was "competent and employable." (Tr. 757.)

On April 22, 2006, Rukhsana Iqbal, a psychiatry resident for the VA, evaluated Thornsley for "psychogenic chest pain." (Tr. 698-702.) Thornsley reported feeling depressed due to marital difficulties. (Tr. 699). He also indicated that he had sleep problems and nightmares related to PTSD. *Id*. Dr. Iqbal noted that Thornsley was working a front-desk job at the Brecksville VA as part of the rehabilitation program. (Tr. 700.) She diagnosed depressive disorder, PTSD, panic attacks with agoraphobia, and alcohol, marijuana, and amphetamine (in sustained full remission) dependence. (Tr. 701.) She recommended continuing Thornsley's prescription of Zoloft for PTSD symptoms and Trazodone for insomnia. *Id*. A GAF score of 55 was assigned. *Id.*

On May 8, 2006, Thornsley's wife served him with divorce papers at the VA residence, exacerbating his depressive symptoms. (Tr. 671, 674-675.) May 12, 2006, treatment notes by Marian Nalepa, a clinical social worker, indicated he was "doing a very good job" working as a front desk monitor, that he got along well with most co-workers, handled supervision well, and learned rapidly. (Tr. 670.) On May 22, 2006, Karen McPeak, Psychiatrist, reported that Thornsley was discharged irregularly, as he left the domiciliary abruptly. (Tr. 705-707; 751-752.) At the time of discharge, Dr. McPeak considered him "medically and psychiatrically stable . . . competent and employable." (Tr. 751-752.)

On June 23, 2006, Thornsley was evaluated by Kevan McCutcheon and Catherine Brandon (student), Clinical Psychologists. (Tr. 735-739.) MMPI-2 testing indicated that "[h]e

5

was acknowledging personal and emotional difficulties, but did not appear to be exaggerating them. * * *  His results suggest that Mr. Thornsley is likely experiencing depression and anxiety."  (Tr. 736.)  Thornsley reported hallucinations and delusions, disassociation from emotions, depersonalization and a lack of meaningful relationships.  *Id*.  It was noted that the test results indicate Thornsley may have a psychotic disorder and that he qualifies for a PTSD diagnosis.  (Tr. 736-737.)  They concluded, however, that "[g]iven the inconsistencies in his report and historical information, it [was] impossible to determine whether he meets the criteria for a psychotic disorder at this time."  (Tr. 739.)

McCutcheon and Brandon further reported that Thornsley's " responses . . . appeared to be somewhat exaggerated, although he did not appear to be fabricating experiences . . .  In addition, some of his answers were contradictory."  (Tr. 737.)  They noted that Thornsley did not return for his follow-up appointment, so the inconsistencies and contradictions were "not explored."  *Id*.  They reported that it was "likely that [Thornsley] was somewhat exaggerating or over-reporting his symptoms, possibly to receive treatment."  *Id*.  While assessing a GAF score of 50, they noted that the unexplored inconsistencies and contradictions in Thornsley's statements made their assessment incomplete.  (Tr. 738-739.)

On October 9, 2007, Graham Young, Ph.D., performed a VA compensation and pension examination of Thornsley.  (Tr. 976-982.)  Dr. Young noted that during the examination, Thornsley was distractible and irritable and reported auditory hallucinations, sleep problems, low energy and generally feeling down.  (Tr. 979.)  During the MMPI-2 testing, Thornsley had to leave to catch his bus, and the test was not completed.  Dr. Young ultimately diagnosed PTSD, depression, alcohol dependence (in remission), cannabis dependence (in remission), and personality disorder.  He assigned a GAF score of 50.  It was noted, however, that there was a possibility that Thornsley was either exaggerating his symptoms, or actually had severe symptoms, or perhaps both.  (Tr. 981.)  Dr. Young further noted that Thornsley's symptoms "are likely to cause work impairment . . . to the extent that he must work cooperatively with others and take direction from an authority figure" and added "his current position where he mostly works alone works well for him."  (Tr. 982.)

6

On December 21, 2007, Mr. Davis saw Thornsley, noting he had completed treatment planning, had been awarded a 50% service-related disability benefit for PTSD, and remained sober.  (Tr. 1025, 1054.)

On April 1, 2008, Larry Hauner, a social worker, signed off on Thornsley's documentation of completion of substance-abuse treatment and six months of sobriety for purposes of reinstatement of his driver's license.  (Tr. 1086.)

On March 14, 2008, Edward Carrol, Ph.D., Director of VA Pain Psychology, evaluated Thornsley for pain management related to his back problems.  (Tr. 1086-1090.)  Thornsley reported that he could no longer "play softball, walk with [his] boys, ride [his] bike, [or] have sex."  (Tr. 1088.)  Dr. Carroll found that Thornsley did have a "mild bilateral L5 radiculopathy . . . [as well as] significant lumbar spine disease to include spinal canal stenosis, disc disease, and facet arthropathy."  (Tr. 1089-1090.)  He further noted that Thornsley's "perception of nociception[7] is dramatically heightened by the patient's significant state of depression.  This is a very credible patient.  One must remember that the patient availed himself of the opportunity to enter the VARC Program and successfully used treatment to 'beat' drugs and alcohol."  *Id*.  Dr. Carrol also noted: "In order to successfully address this veteran's discomfort, it will be necessary to intervene in what appears to be a recent exacerbation of depression."  (Tr. 1090.)  Dr. Carrol ultimately recommended physical therapy, a steroid injection, and medications for sleep and mood problems, as well as cognitive-behavioral therapy to enhance his pain-coping capacity.  *Id*.

Throughout 2008 and 2009, Thornsley sought regular treatment from Nurse Phillips and Mr. Davis.  Their treatment records indicate that Thornsley continued to periodically suffer from nightmares and bouts of depression related to PTSD, although he often reported his medication helped decrease his symptoms.  (Tr. 1016-1017, 1113-1114, 1121-1123, 1154-1155, 1157-1159-1162, 1207-1208.)

---

[7]Nociception means "the ability to feel pain."  *Dorland's Illustrated Medical Dictionary* at 1267, 30th ed. 2003.

7

### *State Reviewing Examinations*

On December 20, 2006, state disability consultant Ryan Dunn, Ph.D., evaluated Thornsley.  (Tr. 851-856.)  Thornsley told Dr. Dunn that he was applying for benefits due to multiple medical conditions, including PTSD, bipolar disorder, and schizophrenia.  (Tr. 851.)  He complained of "bad mood changes," a lack of trust in other people, nightmares, hallucinations, and being afraid of the dark.  *Id*.  He linked these symptoms to an abusive childhood and his military experience.  *Id*.  Thornsley stated that his typical day consists of "sitting in a dark room" sometimes watching television and occasionally doing household tasks, including cooking and laundry.  (Tr. 854.)  Dr. Dunn noted, however, that information in Thornsley's referral included statements from one of his friends describing how she spent 8-10 hours a day with Thornsley reading, playing games and talking.  *Id*.

Dr. Dunn noted that Thornsley was "difficult to interview, frequently providing vague answers requiring frequent clarifying questions."  (Tr. 851.)  Further, he stated that Thornsley "changed numerous details regarding his history, sometimes several times, typically would do initial dramatic descriptions which were contradicted by later less dramatic details."  *Id*.  Dr. Dunn reported that Thornsley was generally not directly responsive to questioning and that his general demeanor was socially inappropriate with "dramatic speech, and flat affect."  (Tr. 853.)  Dr. Dunn thought his behavior "strongly suggested some degree of exaggeration of symptoms and minimization of true functioning."  (Tr. 854.)  He noted that "[m]uch of Thornsley's presentation and reports w[ere] assessed as possibly unreliable to some degree, making the following diagnoses somewhat tentative."  (Tr. 855.)  He then diagnosed PTSD and depression and assigned an overall GAF score of 57.  *Id*.  He found mild limitations in Thornsley's ability to relate to others, and no significant limitations in his ability to understand, remember, and follow instructions, in his ability to maintain concentration, and in his ability to withstand the stress and pressures of day-to-day work.  (Tr. 855-856.)

In December, 2006, Laura Dockham, a disability claims adjudicator, referred Thornsley's claim to the Cooperative Disability Investigations Unit of the Office of the Inspector General on suspicion of fraud.  (Tr. 871-876.)  Ms. Dockham noted inconsistencies in the medical evidence

8

and concluded, "I believe this gentleman is providing false or inaccurate information, and presenting himself with more severe difficulties than he has in an attempt to gain benefits to which he is not entitled." (Tr. 875.)

In response to Ms. Dockham's suspicion, an investigation was conducted by the Cooperative Disability Investigations Unit ("CDIU"). (Tr. 872.) In March, 2007, the CDIU reported that a person familiar with Thornsley identified him as someone who works for a cleaning company, had never mentioned being disabled and was able to carry on a normal conversation. (Tr. 873.) Another person stated that Thornsley walked around the neighborhood "all the time" and did not appear to have any physical problem. *Id*. When CDIU approached Thornsley in his home, he "spoke in a clear and concise voice . . . was able to understand the questions . . . [and] indicated that [he had been] out [of the house] working earlier." *Id*. As a result of the CDIU's investigation, Ms. Dockham reported, "the bottom line is that there is [sic] inconsistencies, exaggerations and contradictions in the clt's statements throughout all of the medical evidence. Clt. is not considered credible." (Tr. 877.)

Based upon Ms. Dockham's recommendation, Alice Chambly, Ph.D., a state consultant assigned to evaluate Thornsley's psychological impairments, concluded that there was insufficient evidence to make an assessment due to his "exaggerations, inconsistencies and contradictions throughout all medical records." (Tr. 878-891.) Bruce Goldsmith, Ph.D., affirmed Dr. Chambly's conclusion. (Tr. 943-944.)

*Hearing Testimony*

At the hearing, Thornsley testified to the following:

- He is disabled due to his inability to communicate with the public and to get along with people. He also has low back issues and carpal tunnel syndrome. (Tr. 37, 40.)

- His last full-time job ended in 2004 when he was fired from a roofing company because he failed a drug test. (Tr. 37.)

- He receives a PTSD pension from the government. (Tr. 37.)

- Since 2004, he has been working part-time in janitorial positions and as a carpet cleaner. (Tr. 39, 45-46.)

- He usually goes grocery shopping with a friend or his fiancé as he has trouble

9

>   communicating with the cashiers. (Tr. 38, 44.)
> 
> - He has help doing the laundry. (Tr. 41.) He does most of his cooking using the microwave. (Tr. 42.)
> 
> - He struggled with alcohol and marijuana addiction in the past, but has been clean since 2005. (Tr. 40.)
> 
> - In the past, he enjoyed fishing, riding bikes and playing softball, but he is unable to do so as he has difficulty carrying items, standing, and sitting. (Tr. 40-41.)
> 
> - In December, 2008, his back problems improved because he was "reunited with religion." (Tr. 41.)
> 
> - He typically spends the day reading the Bible, watching television and picking up around the house. (Tr. 42.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[8]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Thornsley was insured on his alleged disability onset date, January 15, 2004, and remained insured through the date of the ALJ's decision, December 14, 2009. (Doc. No. 9-2 at

---

[8]The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

10

13.) Therefore, in order to be entitled to POD and DIB, Thornsley must establish a continuous twelve month period of disability commencing between January 15, 2004, and December 14, 2009. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Thornsley established medically determinable, severe impairments, due to depression, PTSD, degenerative disc disease of the lumbar spine, chronic obstructive pulmonary disease, and hypertension; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thornsley was found incapable of performing his past work activities, and was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Thornsley is not disabled.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v.*

*Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Thornsley claims the ALJ erred by (1) rejecting the opinions of his treating physicians; and, (2) failing to fully and fairly develop the record.

Thornsley argues the RFC determination was flawed because the ALJ ignored the evidence of his treating sources from the VA. (Doc. No. 12 at 16-17.) He further argues that the ALJ should have either consulted the VA physicians for more information or called a medical expert. *Id.* The Commissioner contends the ALJ's decision is supported by substantial evidence.

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). An ALJ must consider all symptoms

and the extent to which those symptoms are consistent with the objective medical evidence. *Id*. §§ 404.1529; 416.929. An ALJ must also consider and weigh medical opinions. *Id*. §§ 404.1527; 416.927.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[9]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating

---

[9] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

13

physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

> The ALJ set out the RFC as follows:
>
> Thornsley has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) with restrictions. Specifically, he can lift and carry up to 20 pounds occasionally and 10 pounds frequently. In an eight-hour workday, he can sit for six hours and stand and/or walk for six hours. He can occasionally climb ramps and stairs, but cannot climb ladders, ropes or scaffolds. He can occasionally stoop, kneel, crouch, and crawl. He cannot work in proximity to workplace hazards, such as dangerous machinery and unprotected heights. He is limited to simple and repetitive tasks without fast-paced production environment, such as an assembly line. He is limited to occasional interaction with co-workers but no direction [sic] interaction where he is required to communicate with the general public.

(Tr. 16-17.)

Thornsley contends that the ALJ's RFC finding lacks the support of substantial evidence. (Doc. No. 12 at 16.) First, Thornsley claims no medical source proposed the functional limitations adopted by the ALJ. *Id*. He contends that Dr. Dunn, the state agency consultant offered only a tentative diagnosis because of Thornsley's reported exaggeration of symptoms. *Id*. Furthermore, the state agency reviewing psychologists found insufficient evidence in the record to advance a mental RFC. *Id*. Lastly, he avers that no treating source offered a detailed opinion about his specific functional limitations or abilities. *Id*.

As the ALJ discussed, no medical source from the VA opined that Thornsley was incapable of work. (Tr. 22.) In fact, despite his limitations, Thornsley was judged to be

14

"competent and employable" by several VA medical staff. (Tr. 751-752, 757, 791, 796.) Moreover, Thornsley worked as a front desk monitor at the Brecksville VA Center and a clinical social worker indicated that he satisfactorily performed the job, got along with most of his co-workers, and handled supervision well. (Tr. 670.) These findings are consistent with Dr. Dunn's opinion, who evaluated Thornsley after he applied for disability benefits. As the ALJ explained, Dr. Dunn concluded that Thornsley had mild limitations in his ability to relate to others and no significant limitations in his ability to understand, remember and follow instructions; maintain attention, concentration, persistence and pace for simple tasks; and withstand the stress and pressures of daily work. (Tr. 20.) The ALJ gave Dr. Dunn's opinion limited weight as he noted that "the evidence as a whole indicates greater limitations in social functioning." *Id*. The ALJ concluded as follows:

> No treating source refers to Mr. Thornsley as having incapacitating or debilitating symptoms that would prevent him from returning to the workplace at a reduced level of exertion such as in the performance of light work, or has otherwise described Mr. Thornsley as "totally and permanently disabled" by his impairments and complaints.

(Tr. 22.)

Thornsley also claims that the VA treating physicians uniformly supported disabling mental limitations. (Doc. No. 12 at 16.) He refers to Dr. Brandon and Dr. McCutcheon's report dated June 23, 2006, in which they noted that although Thornsley may have been exaggerating during the interview, his symptoms "appear to have had a significant effect on his daily functioning, resulting in difficulty maintaining employment and supportive relationships." (Tr. 739.) In their summary, the doctors indicated that because they were never able to follow-up with Thornsley to complete the report and, because of his inconsistent statements, their assessment is incomplete. *Id*. As such, the ALJ refers to this report, but does not give it any weight. Nonetheless, he notes that Thornsley's attendance in the VA aftercare program resulted in his completion of the program. (Tr. 19.) More importantly, the ALJ accommodated the psychologists' finding that Thornsley experienced anxiety by limiting his work to simple and repetitive tasks without a fast-paced production environment. (Tr. 16-17.)

Thornsley next claims that the ALJ, without explanation, gave only "some weight" to Dr.

15

Young's opinion that Thornsley has a serious impairment in work and functional abilities.  (Doc. No. 12 at 17.)  Dr. Young performed a single psychological evaluation as part of a VA compensation and assessment, concluding that Thornsley's symptoms "are likely to cause work impairment . . . to the extent that he must work cooperatively with others and take direction from an authority figure."  (Tr. 982.)  Again, the ALJ incorporated this finding into his RFC determination by limiting Thornsley to work with only occasional interaction with co-workers and no direct interaction with the general public.  (Tr. 16-17.)

Thornsley also contends that the ALJ did not address Dr. Carrol's entire opinion, but instead chose certain parts that support the RFC.  (Doc. No. 12 at 17-18.)  Thornsley maintains that the ALJ rejected Dr. Carrol's opinion and did not give reasons for such rejection.  (Doc. No. 12 at 18.)

The ALJ concluded that Dr. Carrol found Thornsley's pain to be psychogenic as Thornsley's complaints were inconsistent with an organic syndrome and in excess of what would be expected from physical findings.  (Tr. 20.)  The ALJ's decision states: "Dr. Carrol noted that because Mr. Thornsley was applying for disability benefits, it might 'behoove him at this time to engage more in sick-role behavior as opposed to more physically rehabilitative endeavors." *Id.* The ALJ also notes that at a visit with Dr. Carrol about nine months later, Thornsley reported that he had a religious conversion, that he gave up his cane and pain medications, and that he was walking, wrestling with his kids, and could touch his toes.  *Id*.

The ALJ considered the VA's treatment notes and accordingly restricted Thornsley to a limited range of light work.  Moreover, the ALJ's RFC calculation is also consistent with Thornsley's own statements pertaining to his abilities and limitations.

In addition to Thornsley's medical records, his own statements about his daily activities support the ALJ's determination.  The ALJ summarized Thornsley's activities as follows:

> Mr. Thornsley also testified that the primary reason he is unable to work is that he is unable to communicate or get along with others.  However, he also testified that he had a fiancé, who he has been seeing for six months.  He also has a friend, in whose basement he lives and with whom he goes to church.  In addition to going to church, Mr. Thornsley stated that he does go shopping with his fiancé as well.  Mr. Thornsley stated that he does little housework and that his fiancé does all of the housework.  When asked who did the housework prior to their meeting six

16

> months ago, Mr. Thornsley responded that he did the work.
>
> Mr. Thornsley's reported activities throughout the record are consistent with the ability to perform work within the restrictions set out above. In 2004 and 2005, Mr. Thornsley reported that he spent time fishing and going on outings with his sons, took a family vacation to Disney World, did all of the housework and cared for the children (Exhibit 2F, pp. 11, 14, 24, 34, and 35.) He also was reportedly looking for work during the period. As a resident of the VAMC domiciliary, Mr. Thornsley participated in tai chi classes, bingo games, and arts and crafts (Exhibits 6F, p.2; 7F, p.21; and 12F, pp. 16 and 23). Mr. Thornsley participated in a therapeutic job program and was reported to have done well (Exhibit 13F, p. 4). In April 2006, Mr. Thornsley was again noted to be engaged in a job search (Exhibit 12F, p. 24). In December 2006, Mr. Thornsley reported that he was able to perform household chores, cook, and launder (Exhibit 17F, p. 4). Mr. Thornsley began working part-time as a cleaner in March 2007 (Exhibit 23F, pp. 9-11). In June 2007, he reported riding his bike daily as well as being able to cook and shop (Exhibit 24F, p. 11.)
>
> Evidence of record regarding Mr. Thornsley's daily activities is consistent with a residual functional capacity for sedentary work. However, to the extent that he is self-limited, this does not in itself establish a medical or pathological basis for such restrictions, nor is Mr. Thornsley's [sic] credible in alleging an incapacity for all sustained work activity.

(Tr. 22.) The ALJ properly concluded that Thornsley's own statements and conduct contradict his assertion that his impairments are debilitating.

Finally, Thornsley complains that the mental RFC determination must be defective because he has consistently been given a GAF score of 50. (Doc. No. 12 at 18-19.) Even assuming GAF scores are determinative, the record supports a GAF in the high 40s to mid 50s, and the Sixth Circuit has held that such a score would not preclude him from having the mental capacity to hold at least some jobs in the national economy. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007).

The Court concludes that the ALJ's RFC finding that Thornsley could perform a restricted range of light work is well-supported by all of the medical evidence, including the VA's treatment notes. Additionally, the RFC finding is consistent with Thornsley's own statements about his abilities and limitations.

*Fully and Fairly Developing the Record*

Thornsley asserts that the Commissioner failed in his duty to fully and fairly develop the record, relying on *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048 (6th Cir. 1983). The Commissioner asserts that the ALJ thoroughly examined and evaluated the medical

evidence.  (Doc. No. 14 at 22.)

In the Sixth Circuit, it is well established that Thornsley as the plaintiff--and not the ALJ--has the burden to produce evidence in support of a disability claim.  *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 280 Fed. App'x. 456, 459 (6th Cir. May 29, 2008) (*citing* 20 C.F.R. § 404.15129(a)).  *See also Struthers v. Comm'r of Soc. Sec.*, 101 F.3d 104 (table), 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec'y. of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. 20 C.F.R. §§ 416.912, 416.913(d)."); *cf. Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (although an "ALJ has an inquisitorial duty to seek clarification on material facts," a plaintiff, who is represented by counsel, must provide a "factual record" relating to the length of his employment when his past work was part of the record and was the basis of the initial decision to deny benefits).  However, there is a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures."  *Wilson*, 280 Fed. App'x. at 459 (*citing Lashley  v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)).

The special duty requirement is not at issue in this case since Thornsley was represented by an attorney.  Thus, "the ultimate burden of proving disability" remained squarely on Thornsley.  *Wilson*, 280 Fed. App'x. at 459 (*citing Trandafir v. Comm'r of Soc. Sec.*, 58 Fed. App'x. 113, 115 (6th Cir. Jan.31, 2003)); *see also Guy v. Astrue*, 2010 WL 1141526 at **10-11 (M.D. Tenn. Mar. 4, 2010); *Marion v. Astrue*, 2010 WL 4955714, *4 (N.D. Ohio Nov. 30, 2010).

Thornsley also contends that when there is no opinion evidence from a medical source about functional limitations, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing.  *See Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908 (N.D. Ohio 2008).  Thornsley asserts that the ALJ failed to address the VA opinions regarding functional capacity, but, alternatively, argues that to the extent the VA

18

opinions do not constitute functional capacity opinions, the RFC finding lacks the support of substantial evidence. (Doc. No. 12 at 21.) Furthermore, Thornsley argues that Dr. Dunn's functional opinion was only "tentative," and, therefore, the ALJ had no substantial evidence upon which to base his opinion. (Doc. No. 12 at 21-22.)

The Commissioner responds that the ALJ properly considered the full range of medical evidence in making his RFC determination and no further development of the record was necessary. (Doc. No. 14 at 21.)

"An ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Deskin*, 605 F.Supp.2d at 912 (*quoting Rohrberg v. Apfel*, 26 F.Supp.2d 303 (D. Mass. 1998). Where the "medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate these diagnoses to specific residual functional capabilities such as those set out in 20 C.F.R. § 404.1567(a) ... [the Commissioner may not] make the connection himself." *Id*.

The *Deskin* Court proceeded to note, however, that "where the medical evidence shows relatively little . . . impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *Deskin* at 912 *(citing Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)); *see also Perez v. Sec'y of Health & Human Servs.*, 958 F.2d 445 (1st Cir. 1991).

Thornsley was treated by a wide variety of medical personnel, none of which ever opined that he was incapable of a restricted range of light work. Indeed, the medical sources who offered an explicit opinion as to his capacity to work, found him employable. (Tr. 751-752, 757, 791, 796.) Moreover, Dr. Dunn diagnosed PTSD and depression, but found only mild limitations in Thornsley's ability to relate to others, and no significant limitation in his ability to understand, remember, and follow instructions, in his ability to maintain concentration, or in his ability to withstand the stress and pressures of day-to-day work. (Tr. 855-856.)

The ALJ gave Dr. Dunn's opinion limited weight as "the evidence as a whole indicates greater limitations in social functioning." (Tr. 20.) The ALJ did, however, give some weight to

Dr. Young, who found that Thornsley's symptoms "are likely to cause work impairment . . . to the extent that he must work cooperatively with others and take direction from an authority figure." (Tr. 982.) The ALJ incorporated this finding into the RFC determination by limiting Thornsley to work with only occasional interaction with co-workers and no direct interaction with the general public. (Tr. 16-17.) As such, Thornsley's second assignment of error is without merit.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner should be affirmed and judgment entered in favor of the defendant.

                                                                                    s/ Greg White
                                                                                    United States Magistrate Judge

Date:    June 9, 2011

## OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** See United States v. Walters**, 638 F.2d 947 (6th Cir. 1981).** See also Thomas v. Arn**, 474 U.S. 140 (1985),** reh'g denied**, 474 U.S. 1111 (1986).**